**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) JANE DOE,<br><br>　　　　Plaintiff,<br><br>v.<br><br>(1) ED LAKE, individually and in his Capacity as former Director of THE DEPARTMENT OF HUMAN SERVICES,<br><br>(2) JAMI LEDOUX, individually and in her capacity as former Director of the Child Welfare Services Division of THE DEPARTMENT OF HUMAN Services,<br><br>(3) BRIANA HULL,<br><br>　　　　Defendants. | Case No. 25-cv-00172-CDL<br><br><br><br><br><br><br><br><br><br>ATTORNEY LIEN CLAIMED<br>JURY TRIAL DEMANDED |

**COMPLAINT**

**COMES NOW** the Plaintiff, Jane Doe, by and through her attorneys of record, and for her cause of action against the Defendants Ed Lake, Jami Ledoux, and Briana Hull, sets forth and states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.　　Plaintiff Jane Doe (Plaintiff or Jane Doe) is currently a resident of Tulsa County, Oklahoma.

2.　　Ed Lake ("Lake") is the former Director of the Oklahoma Department of Human Services ("DHS") and was in that role from approximately 2012 until 2019. As the Director of DHS, Lake was responsible for implementing policies and procedures and enforcing policy, including employee caseloads, employee training, child safety, and quality assurance. Upon

information and belief, Lake resides in Oklahoma County, Oklahoma and is being sued in his individual capacity, based on his supervisory role within DHS.

3.      Jami Ledoux ("Ledoux") is the former Interim Director and former Director of the Child Welfare Services ("CWS") Division of DHS.[1]  She was Interim Director from in or around August 2014 until in or around August 2015 and was Director from in or around August 2015 until in or around May 2018. As the Director of the CWS, Ledoux was responsible for running the CWS and implementing and enforcing policies and procedures, including employee caseloads, employee training, child safety, and quality assurance.[2] Upon information and belief, Ledoux resides in Oklahoma County, Oklahoma and is being sued in her individual capacity, based on her supervisory role at DHS.

4.      Upon information and belief to be confirmed through discovery, Briana Hull ("Hull" or "Defendant Hull") was a resident of Tulsa County, Oklahoma at all times relevant hereto. During all times herein, Defendant Hull was employed by DHS as a Child Welfare Specialist. Defendant Hull acting within the scope, course, and authority of her employment and under the color of state law, at all times relevant herein.

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1334 because the matters in controversy arise under the Constitution and laws of the United States.

---

[1]      CWS is the DHS division responsible for administering the state's child welfare services, and its purpose is to improve the safety, permanence, and well-being of children and families involved in the Child Welfare system through collaboration with the families and their community.

[2]      *See*, The Oklahoma Pinnacle Plan: An Improvement Plan for Child Welfare Services at p. 16, DHS, https://oklahoma.gov/content/dam/ok/en/okdhs/documents/okdhs-pdf-library/pinnacle-plan/oklahomapinnacleplanfinal-cfsd-07252012.pdf ("The Child Welfare Division director is responsible for all parts of OKDHS child welfare services, including staff who work directly with families and staff who develop programs and policy.")

Specifically, Plaintiff asserts claims under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.[3]

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside within this Court's judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

- **THE REPEATED RAPE AND ABUSE OF JANE DOE**

11.     Paragraphs 1-6 are incorporated herein by reference.

12.     Jane Doe was born in Colorado Springs, Colorado on December 14, 2004 to Jaime Nimerick ("Jaime") and Scott Askew ("Scott").

13.     Scott and Jaime were married in Coweta, Oklahoma on December 23, 1997, shortly after Scott enlisted in the United States Army.

14.     In 2010, the family relocated to Lawton, Oklahoma, after Scott was transferred to the Fort Sill military base.

15.     In July of 2011, Scott and Jaime filed for divorce and Jaime moved to Broken Arrow, Oklahoma with Jane Doe and her older brother. *See Scott Askew v. Jaime Askew*, Comanche County Case No. FD-2011-652 (Divorce Case).

16.     Shortly after Scott and Jaime separated, Jaime began dating Kevin Norvell (Norvell), who lived in Ohio.

---

[3]     Jane Doe previously filed her claims against the Defendants on December 13, 2023 in *Doe v. The State of Oklahoma, ex rel., the Oklahoma Department of Human Services, et al.,* Case No. 23-cv-539-JFJ. Plaintiff voluntarily dismissed her claims without prejudice in that case on April 12, 2024. *Id.*, Dkt. # 39. Therefore, this action is being re-filed within one (1) year pursuant to 12 O.S. § 100.

17.     Scott and Jaime's divorce was granted on February 3, 2012, and Jaime was given custody of Jane Doe and her brother, while Scott was awarded standard visitation rights.

18.     On March 12, 2012, Jaime married Norvell in Middleton, Ohio. The couple then moved to Jaime's residence in Broken Arrow, where they resided with Jane Doe and her older brother.

19.     Around the time that Jaime and Norvell married, Scott was deployed to Korea as a part of his Army duties.

20.     When Scott's deployment ended in the summer of 2014, he returned to Fort Sill in Lawton, Oklahoma.

21.     While the kids were with Scott in the summer of 2014, Jane Doe disclosed that she had recently been to Ohio with Jaime and Kevin and was made to hide in a closet when a visitor came to the home.

22.     Scott was confused and concerned that Jane Doe was made to hide from public view while in Ohio and conducted a deeper search into Norvell's background.

23.     It was at that time that Scott discovered that on June 6, 1995, Norvell pled guilty to one (1) count of Gross Sexual Imposition of a Minor under 13 in Butler County Ohio. *See State of Ohio v. Norvell*, Butler County Court of Common Pleas Case No. CR 1995 0213 (hereinafter referred to as "the Ohio Criminal Case").

24.     As a result of the conviction, Norvell was required to register as a sex offender. However, due to the imposition of subsequent legislation, Norvell was not required to register as a sex offender beginning in 2011, the same year he began dating Jaime.

25.     Upon learning that Norvell was a convicted sex offender, Scott filed an *Emergency Motion for Temporary Custody* in the Divorce Case on July 31, 2014, requesting that he be granted sole physical custody of the children. Scott also made a referral to DHS for an investigation.

26.     Scott's emergency motion was granted, and he was given temporary custody of the children, pending a hearing on the matter. At the subsequent hearing on his Motion, which occurred on October 22, 2014, the court noted that Scott had "a right to be concerned" about Norvell, but ultimately dismissed the emergency custody order because the court could not find any evidence that the kids were being mistreated at that time.

27.     While Scott was aware that Norvell had pled guilty to  Gross Sexual Imposition of a Minor under 13, he was unaware that Norvell had also been charged with one (1) count of Attempted Rape in the Ohio Criminal Case due to his actions toward a two-year-old child.

28.     In the criminal case filed against Norvell for his actions towards Jane Doe, Tulsa County Special Judge James Keely summarized Norvell's actions in the Ohio Criminal Case as follows:

> In 1995, the Defendant was at Kathy Gilley's house, who was dating the Defendant's cousin. The Defendant went upstairs to the bathroom, and the Defendant stated he had an urge to do something to Ms. Gilley's two-year-old child A.E. who was in the upstairs bedroom. The Defendant put vaseline on his penis. The Defendant then proceeded to put vaseline on A.E.'s rectum. The Defendant stated that he started to insert his penis, but he had flashbacks to when he was molested as a child, so he discontinued penetration.

*See Findings of Fact and Conclusions of Law*, filed February 15, 2019 in *See State of Oklahoma v. Norvell*, Tulsa County Case No. CF-2018-3993 (hereinafter referred to as "the Tulsa County Criminal Case").

11.     Not long after Jane Doe and her brother were returned to Jaime and Norvell in the fall of 2014, Norvell began sexually assaulting Jane Doe.

12.     The abuse began with Norvell telling Jane Doe the places where people were not allowed to touch her. Norvell used these conversations as a way to begin molesting Jane Doe.

13.     Norvell quickly escalated his abuse and began forcing Jane Doe to have vaginal intercourse.

14.     Jane Doe was approximately ten years old the first time Norvell raped her.

15.     At that time, Norvell was assaulting Jane Doe multiple times a month.

16.     In an effort to hide the abuse, Norvell demanded that Kiera tell no one about the abuse. If Norvell believed that Kiera had disclosed the abuse to anyone he would force her to say that she had made the allegations up.

29.     For instance, on one occasion Kiera mentioned to a friend that she was being abused by her stepfather via an online messaging application. Norvell found the messages and forced Jane Doe to tell her friends that she had made up the allegations.

30.     Then, in the fall of 2017, when she was just twelve (12) years old, Jane Doe informed a classmate that she was being molested by Norvell.

31.     Jane Doe was in 6th grade at Union Public School's ("UPS") 6th and 7th Grade Center when she informed her friend of Norvell's predatory behavior.

17.     Jane Doe's classmate told her mother about Jane Doe's claim. In response, the classmate's mother immediately reported the alleged abuse to UPS.

18.     UPS promptly relayed the report regarding Kiera's allegations to DHS, as required by 10A O.S. § 1-2-101.[4]

19.     In response to the report from UPS, DHS assigned Defendant Hull to conduct an investigation into Jane Doe's allegations.

---

[4]     UPS did not, however, notify Scott of Jane Doe's allegations.

20.     As a part of her investigation, Ms. Hull first spoke to Jane Doe at the 6th and 7th Grade Center regarding the statements she made to her classmate.

21.     During the interview, Jane Doe did as Norvell had instructed and told Defendant Hull that she had made up the allegations about Norvell to get attention.

22.     Despite DHS guidance that "[a] child  recantation of a previous account of sexual abuse is not uncommon," Hull did not press the issue any further and ended the interview after Jane Doe recanted. *See Instructions to Staff*, Okla. Admin. Code ("OAC") 340:75-3-120(40)(7).

23.     Believing that Jane Doe had simply made up the allegation about Norvell, Hull proceeded to speak with numerous other family members, including Jane Doe's older brother, Jane Doe's grandmother (Jaime's mom), Kevin, and Jaime, to determine whether there were any issues at home that would have prompted her to make a false allegation.

24.     However, Hull never spoke or attempted to speak with Scott regarding Kiera's report or recantation.

25.     Hull spoke with Jane Doe's grandmother via telephone regarding Jane Doe's general well-being but did not mention anything about Jane Doe's allegation that Kevin was sexually abusing her.

26.     Upon information and belief, Hull spoke with Jaime and Kevin at their home and informed them that Jane Doe had made a false allegation that Kevin had sexually abused her. Predictably, Kevin and Jaime denied that any such abuse took place, and expressed concern that she would make such a claim.

27.     Despite Jane Doe's allegation that she was being sexually abused, Hull either failed to investigate and/or simply ignored Norvell's criminal background. As a result, Hull was either unaware or ignored, that Norvell had previously been convicted of attempting to sexually abuse a

two (2) year old in Ohio. Nor was Hull aware that Norvell had previously been required to register as a sex offender as a result of his conviction.

28.    At the conclusion of her haphazard investigation, Hull determined that Jane Doe's apparent false report was due to her being isolated. Based on that conclusion, Hull directed Jaime to place Jane Doe into therapy within two (2) weeks.

29.    After two (2) weeks, Hull checked in on Jane Doe and discovered that she had not been placed into therapy as had been instructed.

30.    Hull gave Jaime and Norvell an additional week to place Jane Doe into therapy.

31.    Upon information and belief to be confirmed through discovery, at or around this time, Hull left her employment with DHS and therefore did not follow up to ensure that Jane Doe was placed into therapy.

32.    Upon information and belief to be confirmed through discovery, after Hull left her employment, DHS did not assign a new Child Welfare Specialist to the case and essentially abandoned the investigation.

33.    With no oversight from DHS, Jane Doe was never placed in therapy, where she would have been able to speak with a trained professional about Norvell, without fear that Norvell would retaliate against her.

34.    Not long after DHS abandoned its investigation, Jaime and Norvell withdrew Jane Doe from UPS, for Jane Doe to do online schooling at home.

35.    By requiring Jane Doe to do her schooling at home, Jane Doe was even more isolated than she was before she reported Norvell's abuse.

36.    While Jane Doe did her schooling at home, Jaime worked and Norvell, who was unemployed, stayed with Jane Doe.

37.    With Jane Doe home alone with Norvell each school day, Norvell increased both the frequency and severity of his abuse.

32.    In particular, while Jane Doe was attending school online, Norvell began raping her almost daily.

38.    As a result of one of his many rapes, Norvell impregnated Jane Doe, who was just thirteen (13) years old.

39.    Being just thirteen years old, Jane Doe was not familiar with pregnancy symptoms and therefore received no prenatal care.

40.    Many months into her pregnancy, Jane Doe was complaining of symptoms consistent with pregnancy. Norvell told Jane Doe that he suspected that she may be pregnant. Norvell instructed Jane Doe that if she was, in fact, pregnant, she was to tell no one that the child was his. Norvell demanded that Jane Doe tell people that she had been impregnated by a boy who lived across the street.

41.    One evening in August of 2018, Jane Doe began to experience severe pains, which she later learned were contractions. Fearful that the pains were related to the possible pregnancy, Jane Doe informed her mother for the first time that she believed she may be pregnant and needed to go to the hospital.

42.    Jane Doe told her mom, as she had been directed by Norvell, that she had been impregnated by a boy who lived across the street.

43.    Jaime took Jane Doe to the hospital and on August 16, 2018, Jane Doe gave birth to a baby boy.

44.    It was later confirmed that Norvell was the father of Jane Doe's child.

45.     Norvell was subsequently charged with six felony counts related the abuse. *See State of Oklahoma v. Norvell*, Tulsa County Case No. CF-2018-3993.

46.     On September 26, 2019, Norvell pled guilty to the charges and was sentenced to 45 years in the custody of the Department of Corrections.

47.     Following the birth of her son, Jane Doe made the brave and difficult decision to place her son up for adoption.

- **DHS FAILURES**

48.     Paragraphs 1-47 are incorporated herein by reference.

49.     DHS (which was originally known as the "Department of Public Welfare") was created in 1936 by § 2 of Article 25 of the Oklahoma Constitution for the purpose of "administering and carrying into execution" all laws enacted by the Oklahoma Legislature pursuant to § 1 of Article 25. *See* 56 O.S. § 162.1(a). Section 2 also required DHS to "perform such other duties as may from time to time be prescribed by law." *See generally City of Sand Springs v. Dep't of Pub. Welfare*, 1980 OK 36, 608 P.2d 1139.

50.     DHS' "other duties prescribed by law" include various responsibilities in the administration of the Oklahoma Children's Code, 10A O.S. § 1-1-101, *et seq*., including the duties to investigate reports of suspected child abuse and neglect.

51.     Upon receiving a report of alleged child abuse or neglect, DHS "shall promptly respond to the report by initiating an investigation of the report or an assessment of the family in accordance with priority guidelines established by the Department." *See* 10A O.S. § 1-2-105(A)(1); *see Hulley v. Huckaby*, 902 F.3d 1136, 1151 (10th Cir. 2018) ("Under Oklahoma law,

when DHS receives a report of "child abuse or neglect," it must "promptly respond to the report by initiating an investigation.") (citing 10A O.S. § 1-2-105(A)(1)).[5]

52.     Here, DHS and Defendant Hull wholly failed to investigate and/or assess Jane Doe's allegation that she was being abused by Norvell, in accordance with DHS policies and procedures, and affirmatively acted to increase the danger Jane Doe faced of being sexually abused by Norvell.

53.     For starters, Defendant Hull and/or DHS failed to utilize or consider a number of resources which DHS policies required to be considered during an assessment or investigation.

54.     It is obvious that Hull either was unaware or completely ignored the fact that Norvell had pled guilty in the Ohio Criminal Case, to attempting to sexually abuse a two-year-old in Ohio. It is unconscionable that Hull would either not know of this charge or that she would have disregarded it.

55.     DHS policy provides that "[w]hen there is prior CW ["child welfare"] history involving the adults and children listed in the current or pending abuse or neglect reports, the history is reviewed prior to initiating the assessment or investigation." *See* Instructions to Staff, OAC 340:75-3-200(4)(1).

56.     As noted above, Scott informed DHS of Norvell's criminal charges in Ohio, in 2014 we he discovered the Ohio Criminal Case. *See*, ¶BLANK, *supra*. As such, had Hull consulted Jaime and Norvell's history after learning of Jane Doe's report – as she was required to do by DHS policy - she would have been aware of Norvell's criminal past.

---

[5]     "The primary purpose of the investigation or assessment shall be the protection of the child." 10A O.S. § 1-2-105(A)(1).

57.     Moreover, Hull and DHS failed and/or refused to utilize a multidisciplinary team to assist in investigating Jane Doe's report.

58.     10A O.S. § 1-2-105(B)(2), provides that "[t]he investigation of a report of sexual abuse or serious physical abuse or both sexual abuse and serious physical abuse shall be conducted, when appropriate and possible, using a multidisciplinary team approach as provided by Section 1-9-102 of this title."[6]

59.     A multidisciplinary child abuse team provides resources such as forensic interviews to ensure an adequate investigation is performed. *See* OAC 340:75-3-440(a)(2).

60.     Here, DHS failed and/or refused to engage a multidisciplinary child abuse team to investigate Jane Doe's allegations, despite her report that she was being sexually abused by her stepfather.

61.     Had Hull and/or DHS sought assistance from any of the trained specialists available to them, it would have become clear that Jane Doe did not simply make up her claims.

62.     Hull further failed to have Jane Doe medically and mentally evaluated to determine whether her allegations had any merit.

63.     DHS policy dictates that a medical examination of the child is required in "all sexual abuse cases in which oral or genital skin-to-skin contact is alleged or suspected." *See* Instructions to Staff, OAC 340:75-3-200(14).

---

[6]     *See, Optimizing the Multidisciplinary Team Approach,* Oklahoma Commission on Children and Youth*,* https://oklahoma.gov/occy/departments/freestanding-multidisciplinary-teams.html (last accessed April 8, 2025) ("[Multidisciplinary teams] consist of professionals from prosecution (i.e., District Attorney), law enforcement, Child Welfare Services (Oklahoma Department of Human Services), medicine, mental health, domestic violence (recommended), and other related fields that promote coordination and teamwork needed to ensure a timely and appropriate response to investigations of child maltreatment.").

64.     In light of Jane Doe's conflicting reports regarding the abuse, Hull certainly could have ordered a medical examination be performed, which would have likely revealed that her original report of sexual assault was true

65.     Moreover, Defendant Hull and DHS took steps to preclude Scott – who had his own concerns regarding Norvell – from the investigation into Jane Doe's allegations. In spite of DHS policy and Oklahoma law requiring that Scott be notified of the investigation into Jane Doe's allegations, Hull and/or DHS never even attempted to notify Scott of Jane Doe's allegations or its subsequent investigation.

66.     DHS policy is clear that "[t]he noncustodial parent is entitled to the same information as the custodial parent and diligent efforts are made to locate and interview the noncustodial parent during the initial stages of the investigation." *See* Instructions to Staff, OAC 340:75-3-220(5)(5).[7]

67.     The failure to alert and notify Scott of the investigation is particularly problematic in light of the fact that Scott was an active member of the United States Army and deployed at the time of the investigation.

68.     Oklahoma law requires that "[u]pon initiation of an assessment or investigation, DHS must inquire as to the military status of all parents or legal guardians." *See* Instructions to Staff, OAC 340:75-3-220(12). Further:

> If the Department determines that a parent or guardian is currently serving on active duty in the United States military, the Department shall notify a United States Department of Defense family advocacy program that there is an investigation into the parent or guardian.

10A §1-2-102(a)(4).

---

[7]     *See* Instructions to Staff, OAC 340:75-3-220(5)(6) (the DHS investigator is required to "inform[] the noncustodial parent of the situation and gather[] any critical information.").

69. It was unquestionably clear that Scott was required to be informed of DHS' investigation. However, Hull and DHS did not even attempt to contact Scott to make sure that he was aware of his daughter's allegations.

70. DHS' failures in regard to the November 2017 investigation are not limited solely to Hull. Rather, the failure to conduct an adequate investigation should be seen as a complete institutional failure, one which the Supervisory Defendants were responsible for ensuring did not occur.

71. For instance, Hull instructed Jaime and Norvell to have Jane Doe evaluated by a therapist. That evaluation never occurred because after Hull left her employment with DHS, the issue fell through the cracks and no one at DHS followed up to ensure that therapy was provided.

72. DHS policies advise that when a parent "refuses to secure needed medical, psychological, or psychiatric attention for the child" DHS can request that a DA seek a "court order application to secure needed services." *See* Instructions to Staff, OAC 340:75-3-200(14)(4).

73. DHS had ample resources to ensure that therapy was provided to Jane Doe, which ostensibly could have identified that Jane Doe had not made up her prior report that Norvell was abusing her, but those resources were not utilized due to the institutional failures within DHS.[8]

74. The aforementioned acts and/or omissions of DHS staff, as described above, in being deliberately indifferent to Jane Doe's health and safety, was in furtherance of and consistent with customs, policies, and/or practices Defendant Lake and Defendant Ledoux (hereinafter

---

[8]     *See* Instructions to Staff, OAC 340:75-3-200(14)(4) (when a parent or guardian "refuses to secure needed medical, psychological, or psychiatric attention for the child, the CW specialist evaluates the level of risk to the child and determines whether to make a request to the DA for a court order application to secure needed services.").

referred to as "the Supervisory Defendants") promulgated, created, implemented and/or possessed responsibility for.

75.    Such policies, customs and/or practices, include, but are not limited to:

a.    Failing to ensure that DHS employees, such as Defendant Hull, were adequately trained and competent to investigate complaints of child sexual abuse;

b.    Failing to supervise and monitor DHS employees, such as Defendant Strain, during any such investigation into child sexual abuse;

c.    Failing to ensure that non-custodial and/or military parents were notified of DHS investigations as required by law;

a.    Failing to adopt any policies or procedures to monitor or protect children like Jane Doe, who live in a household with an individual who was previously required to register as a sex offender but is not actively on the sex offender registry.

d.    Failing to adopt policies, practices, or procedures to ensure that an investigation is followed up on and/or not abandoned when the CWS employee assigned to the investigation leaves their employment with DHS;

e.    Failing to ensure that CWS employees had manageable caseloads; and

f.    Failing to consult available resources, such as a multidisciplinary team, physicians, child abuse specialists, etc., to investigate credible evidence of child sexual abuse.

76.    In particular, it is clear that the Supervisory Defendants failed to adequately train Child Welfare Specialists, including Defendant Hull, regarding the steps necessary to ensure that sexual abuse allegations are fully adequately investigated.

77.    As shown above, Hull violated a number of DHS policies and guidance which would have ensured that Jane Doe's November 2017 report was fully vetted and that she was protected from any further abuse.

78.     For instance, DHS procedure states that "[e]ach child sexual abuse, physical abuse, or neglect investigation and child victim interviews are conducted by appropriate personnel using the protocols and procedures per 10A O.S. § 1-9-102." *See* OAC 340:75-3-200(c). Pursuant to 10A O.S. § 1-9-102(C)(1)(g), persons "conducting child abuse investigations and interviews of child abuse victims shall be trained in the multidisciplinary team approach, conducting legally sound and age-appropriate interviews, effective investigation techniques and joint investigations as provided through the State Department of Health, the Commission on Children and Youth, or other resources."

79.     Upon information and belief, DHS failed to adequately train CWS employees, including Defendant Hull, regarding how to conduct age-appropriate and effective interviews of children who have alleged that they were being sexually abused.

80.     The Supervisory Defendants further implemented a policy whereby Child Welfare Specialists, like Defendant Hull, had far too many cases, making it difficult, if not impossible, for them to adequately investigate reports of sexual abuse.

81.     The excessive caseload placed on CWS staff is a longstanding and well-documented problem within DHS.

82.     For instance, in 2008 DHS entered into a settlement agreement in *D.G., et al. v. Yarbrough, et al.*, Case No. 4:08-cv-000074 (N.D. Okla.), resolving a class action lawsuit that alleged children were experiencing systematic violations of their constitutional rights due to DHS' poorly resourced and managed child welfare system.

83.     As a part of that settlement, DHS developed "an improvement plan, called the Oklahoma Pinnacle Plan," to implement a number of structural changes within DHS to better serve children and families.[9]

84.     The Pinnacle Plan addressed 15 performance areas that required structural changes, which included limiting the caseload of CWS workers to ensure that they have adequate time, training, and resources to protect the children referred to DHS.[10]

85.     However, it is clear that the Supervisory Defendants have failed to ensure that the Pinnacle Plan is implemented appropriately to ensure that CWS employees are not overburdened by too heavy of a caseload.

86.     For instance, a number of current and former DHS employees filed a lawsuit in 2019, alleging that DHS had failed to implement the Pinnacle Plan, by forcing employees to carry "caseloads [that] often exceed ten times the amount allowed under the Pinnacle Plan." *See First Amended Class Action Petition* at p. 5, ¶5, Dkt. #1-8, *Dawn Bolt, et al., v. Ed Lake, et al.*, Case No. 5:20-cv-00795-J (W.D. Okla.).

87.     The Plaintiffs in *Holt* further alleged that during their employment:

   a.   DHS often assigned up to 60 or more cases to individual workers, who should have been assigned no more than 12 cases;

   b.   Oklahoma City, the largest city in the state, should have had 90 workers in order to meet the requirements of the policy, but had only 30-40 at any given time;

   c.   Supervisors who should have supervised 5 or 6 workers with 12 cases each (for a total of 60 to 70 cases), were instead supervising workers who themselves were assigned to 60 or more cases, such that the supervisors' workload was 5-6 times greater than it should have been;

---

[9]      *See*, Oklahoma Pinnacle Plan Home, https://oklahoma.gov/okdhs/services/child-welfare-services/the-oklahoma-pinnacle-plan/pinnacle-plan-home.html

[10]     *See*, n. 2, *supra*.

d.  Workers were directed to close a certain number of case investigations per week or else they would be written up, regardless of whether the case had been properly investigated;

e.  Workers were not given adequate resources to care for children in the DHS system, such that children were left in unsafe situations; and

f.  Defendants made decisions, not based on the best interest of children and families, but in the interest of keeping numbers low to make it look as if DHS was in compliance with the Pinnacle Plan.

*Id*. at p. 24, ¶78.

88.    The Supervisory Defendants were responsible for implementing the Pinnacle Plan to ensure that caseworkers were not overburdened.

89.    Upon information and belief, at the time of the subject events, the Supervisory Defendants failed to implement the Pinnacle Plan and overburdened CWS employees, such as Defendant Hull, with too many investigations.

90.    Upon information and belief, pursuant to this custom, Defendant Hull was responsible for too many investigations and/or assessments, thereby preventing her from fully and adequately addressing serious sexual abuse allegations.

91.    As a result of these customs and/or practices, Jane Doe's report regarding Norvell's abuse was dismissed and/or not fully investigated, leaving Jane Doe vulnerable to further abuse from Norvell.[11]

92.    As shown above, the Supervisory Defendants were on notice that the aforementioned customs and/or practices were well established within DHS and that such customs and/or practices would likely result in harm to children who report sexual abuse.

---

[11]    As noted above, Norvell's abuse escalated dramatically after DHS abandoned its investigation. *See*, ¶BLANK, *supra*.

93.     However, rather than address the issues caused by the aforementioned customs and/or practices, the Supervisory Defendants ignored the deficiencies, thereby allowing Norvell further opportunity to assault, and ultimately impregnate Jane Doe.

## CAUSES OF ACTION

I.  **VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES' RIGHT TO DUE PROCESS AND PROMISE OF EQUAL PROTECTION (42 U.S.C. § 1983)**

94.     Paragraphs 1-93 are incorporated herein by reference.

- ***As to Defendant Hull***

95.     Pursuant to the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the Defendants had a constitutional duty not to create a danger or increase Jane Doe's vulnerability to a danger of sexual abuse.

96.     This duty was clearly established at the time of the events giving rise to this action.

97.     Here, Defendant Hull affirmatively acted to increase the danger faced by Jane Doe when she informed Jaime and Norvell that Jane Doe had falsely alleged Norvell abused her. Defendant Hull further acted affirmatively by knowingly withholding information she was required to provide to Scott, pursuant to DHS policy.[12]

98.     Defendant Hull's actions created and/or increased the risk that Jane Doe would be sexually assaulted by Norvell.

---

[12]     *See T.D. v. Patton*, 868 F.3d 1209, 1226 (10th Cir. 2017) (finding that a child welfare worker had acted affirmatively for the purposes of a danger-creation claim, when she "intentionally withheld relevant information from her final report" during an investigation into child abuse).

99.     Jane Doe is a member of a limited and specifically definable group of children –
*i.e.*, those who report that they were being sexually abused by members of their household.[13]

100.     Defendant Hull's actions, as described herein, placed Jane Doe at an obvious risk
of being sexually abused by Norvell. In particular, it was obvious that downplaying and failing to
vet Jane Doe's allegation that she was being sexually abused, placed Jane Doe at a serious and
immediate risk of being abused further.

101.     Defendant Hull acted in conscious disregard of the known and obvious risks to Jane
Doe faced, thereby increasing her vulnerability to danger.

102.     When viewed in total, Defendant Hull's acts and omissions, as described herein,
shock the conscious.

103.     Defendant Hull's actions, or lack thereof, were the proximate cause of the injuries
Jane Doe sustained herein.

104.     As a direct and proximate result of Defendant Hull's actions, or lack thereof, Jane
Doe sustained actual damages, including injuries to her person, pain, severe mental and emotional
suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, anxiety,
distress and other actual damages in excess of seventy-five thousand dollars ($75,000.00).

105.     Defendant Hull's conduct which caused this damage showed complete indifference
to and/or conscious disregard for the health and safety of Jane Doe and others, justifying the
imposition of punitive damages.

- ***As to Supervisory Defendants***

106.     Paragraphs 1-105 are incorporated by reference.

---

[13]     Jane Doe is also a member of a limited and specifically definable group of children who
report sexual abuse and the later recant that allegation when questioned by DHS.

107.    Defendant Lake, as the Director of DHS, and Defendant Ledoux, as Director of the CWS Division of DHS, had supervisory responsibilities to ensure that DHS adopted and implemented policies to protect children who report sexual abuse from unreasonable risks of harm.

108.    As noted above, due to DHS employees', including Defendant Hull, choice, refusal, failure to act, and/or creation of danger, Jane Doe suffered immense and irreparable harm.

109.    There is an affirmative link between the aforementioned acts and/or omissions of Defendant Hull and other DHS employees in creating and/or increasing Jane Doe's vulnerability of being sexually abused by Novell, and policies, practices, and/or customs which the Supervisory Defendants promulgated, created, implemented and/or possessed responsibility for.

110.    Such policies, customs and/or practices are specifically set forth in paragraphs 70-93, *supra*.

111.    The Supervisory Defendants had knowledge (either actual or constructive knowledge) that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of children who report sexual abuse, like Jane Doe.

112.    The Supervisory Defendants' failure to implement and/or execute the aforementioned policies was egregious, outrageous, and conscious shocking and resulted in the deprivation of Jane Doe's constitutional rights.

113.    The Defendants' actions, or lack thereof, were the proximate cause of the injuries Jane Doe sustained herein.

114.    As a direct and proximate result of the Supervisory Defendants' actions, or lack thereof, Jane Doe sustained actual damages, including injuries to her person, pain, severe mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock,

nervousness, anxiety, distress and other actual damages in excess of seventy-five thousand dollars ($75,000.00).

115.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of Jane Doe and others, justifying the imposition of punitive damages.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including, but not limited to, damages for injuries to her person, physical pain, past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present, future enjoyment of life, loss of future earnings and earning capacity, in excess of seventy-five thousand dollars ($75,000.00), attorney's fees, punitive damages in excess of seventy-five thousand dollars ($75,000.00), and all other relief deemed appropriate by this Court.

Respectfully submitted,

SMOLEN LAW, PLLC

/s/ John W. Warren
Donald E. Smolen, II, OBA #19944
Michael F. Smith, OBA #14815
John W. Warren, OBA# 33635
611 S. Detroit Ave.
Tulsa, OK 74120
Tel: 918-777-4529
Fax: 918-890-4529
don@smolen.law
michael@smolen.law
jack@smolen.law